# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CASE NO.: 1:17-CR-43-TLS |
| | ) | |
| ABDULAZIZ AL-BALAWI | ) | |

## OPINION AND ORDER

Defendant Abdulaziz Al-Balawi pled guilty to smuggling goods from the United States and aiding and abetting, in violation of 18 U.S.C. § 554(a) and 18 U.S.C. § 2. The probation officer drafted a Final Presentence Investigation Report (PSR) in preparation for sentencing. This Opinion and Order resolves the Defendant's objections to the PSR.

## BACKGROUND

On March 10, 2017, investigators from the Indianapolis Joint Terrorism Task Force (JTTF) conducted an interview with a witness on a separate investigation. The witness showed investigators a phone screenshot of an eBay transaction involving two .308 caliber rifle barrels. JTTF determined that the eBay username the witness provided was registered to Abdulaziz Alharbi, and that the shipping information included the Defendant's name and his home address in Fort Wayne, Indiana. On March 27, 2017, Homeland Security Investigations (HSI) received corroborating information that Alharbi was coordinating the purchase and export of firearm barrels, which were concealed inside appliances, from the United States to Saudi Arabia. HSI contacted eBay and PayPal, and confirmed that the Defendant's address was listed as the shipping address.

On April 14, 2016, the Fort Wayne Police Department (FWPD) received information suggesting that the Defendant had received parcels containing cylinders similar in size to rifle barrels and that he repackaged the cylinders by zip tying them, wrapping them in paper, and placing them inside the small appliances.

On April 17, 2017, HSI intercepted a package on its way to an individual in Saudi Arabia. HSI removed five .223 caliber rifle barrels from the package. HSI also learned that the same delivery service had three additional shipments linked to the same individual in Saudi Arabia. All three packages contained kitchen range hoods with rifle barrels secreted within the hoods. The customs declaration forms did not identify the barrels but listed only the kitchen products. One of the packages was sent by the Defendant from his home address.

On May 10, 2017, the Magistrate Judge authorized a search warrant for the Defendant's residence. HSI, JTTF, and the FWPD executed the warrant and recovered receipts, packing materials, and travel documents. They located the Defendant in another area of the same building complex and he agreed to speak with investigators.

The Defendant admitted that he shipped approximately 20 rifle barrels to Saudi Arabia on four or five separate occasions. He further admitted that his brother, Mohammed Salem Al-Balawi, who lives in Saudi Arabia, would order the barrels and appliances and have them shipped to the Defendant's home. The Defendant would then take the barrels and conceal them into appliances, and he admitted that he concealed the barrels inside of the appliances in order to avoid discovery by customs officials. Another individual known to the Defendant as "AboReem" provided the Defendant with directions on how to use freight forwarders to ship the barrels. The Defendant, his brother, and AboReem corresponded using encrypted applications, text messages, phone calls, videos, and chats. The Defendant admitted that he and his co-conspirators received

$1,000 per rifle barrel, and overall, they earned $10,000 to $20,000. The Defendant maintained that once the barrels reached Saudi Arabia, they were sold to people so they could build weapons to own and hunt with. The Defendant allowed investigators to access his phone and showed them pictures, videos, and messages depicting the Defendant concealing rifle barrels in appliances.

Investigators determined that rifle barrels are controlled on the United States Munitions List and that a State Department license is required for export or temporary import. Neither the Defendant nor the intended recipient of the package had obtained the required license. Thus, on August 28, 2017, the Defendant was arrested. The Defendant was charged with smuggling goods from the United States and aiding and abetting. On November 30, 2017, the Court accepted the Defendant's plea of guilty to the sole count of the Indictment [ECF No. 1].

The PSR includes a calculation of the base offense level, explaining that the base offense level for the offense at issue is 26 points. *See* U.S.S.G. §§ 2M5.2(a)(1). The PSR also includes reductions for acceptance of responsibility, leading to a total offense level of 23.

The Defendant filed a Sentencing Memorandum [ECF No. 44] in which he argues for a two-level reduction of his base offense level because he maintains he was a minor participant in the offense, pursuant to U.S.S.G. § 3B1.2. The Defendant also requests an additional downward reduction because he claims that the matter was not harmful to the United States, pursuant to U.S.S.G. § 2M5.2. Finally, the Defendant requests a variance in consideration of 18 U.S.C. § 3553 sentencing factors.

The Government disagrees and contends that the PSR should not be altered.

# ANALYSIS

## A.     Role in the Offense

As relevant here, U.S.S.G. § 3B1.2 provides for a reduction of the offense level for a defendant who played a lesser role in an offense. If a defendant was a minimal participant in any criminal activity, the defendant receives a four-level reduction. U.S.S.G. § 3B1.2(a). If the defendant was a minor participant in any criminal activity, the defendant receives a two-level reduction. U.S.S.G. § 3B1.2(b). Defendants falling in between these two categories receive a three-level reduction. The guidelines explain that "[t]he determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based upon the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, cmt. n.3(C). The commentary lists non-exhaustive factors for courts to consider:

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;
(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;
(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
(v)     the degree to which the defendant stood to benefit from the criminal activity.

*Id.* A defendant is considered a minimal participant if he is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. n.4. Among the least culpable are those who lack knowledge or understanding of the scope and structure of the enterprise and of the activities of others. *Id.* By comparison, a minor role adjustment of two points is appropriate if a defendant is "less culpable than most other participants," but whose role could not be described as minimal. U.S.S.G. § 3B1.2, cmt. n.5.

A defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled to a role reduction. *United States v. Haynes*, 582 F.3d 686, 709 (7th Cir. 2009). The Court must evaluate the Defendant's role "in context of the other participants in the scheme, keeping in mind that a minor [or minimal] player is substantially less culpable than the average participant, not the leaders." *United States v. Leiskunas*, 656 F.3d 732, 739 (7th Cir. 2011) (citing *United States v. Sorich*, 523 F.3d 702, 717 (7th Cir. 2008)); *see also United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007) (holding that when assessing whether a defendant is entitled to a role reduction, his role "should be compared to that of the average member of the conspiracy, not with the leaders").

In this case, the parties do not dispute the factual role of the Defendant in the conspiracy. Rather, they focus on categorizing his role pursuant to the Sentencing Guidelines. The Defendant contends that he was a minor participant in the conspiracy because he did not exercise any discretion or make substantive decisions, and rather performed a discrete task. He maintains that an appropriate analogy for his role in the conspiracy is that of a drug mule:

> [M]uch like a mule, [the Defendant] did not recruit or manage any other participants. He also 'transported' (i.e. shipped) illegal items and took on the risk of arrest by American authorities, as do mules. He never purchased or sold the illegal items either, and he received the smallest share of the profits.

(Def.'s Sentencing Mem. 10, ECF No. 44.) The Defendant points out that couriers of illegal drugs are necessary for the drug operation, but they frequently receive minor role reductions by courts pursuant § 3B1.2 because "playing a necessary role does not definitively prevent the same role from being minor." *Leiskunas*, 656 F.3d at 739. The Defendant also points out though he shipped items on multiple occasions "a criminal participant that commits a minor act is not necessarily precluded from minor role consideration simply because the minor act is repeated." *Id.*

The Defendant further argues that even if the Court does not find the analogy to the drug courier persuasive, the Defendant should receive a two-level reduction because he played a less significant role than his co-conspirators. His co-conspirators created the scheme, purchased the barrels online, recruited the Defendant, had the barrels shipped to the Defendant's home, instructed the Defendant on how to hide the barrels, provided the Defendant with the addresses in Saudi Arabia to send the barrels, and retained most of the profits.

The Court disagrees with the Defendant's arguments, and finds that that the drug mule analogy is inappropriate to this case because "[i]t was not as if [the Defendant] simply had to deliver a ready-to-go package of contraband from one location to another." (Govt's Resp. 2, ECF No. 45.)

> A common drug mule receives drugs already packaged and is told to just take the package from point A to point B. The common drug mule typically does not use their own residence as the deposit location for the contraband. The common drug mule is not typically responsible for packaging and then secreting the drugs, and the common drug mule does not have to falsify documents to transport drugs from one location to another.

(*Id.*) Instead, here, the Defendant allowed his address to be used as the location where the rifle barrels and range hoods were shipped, and then actively participated in making sure the barrels arrived in Saudi Arabia:

> The rifle barrels were not shipped to [the Defendant] already repackaged and zip-tied into the range hoods ready for [the Defendant] to just take them from one location to another. [The Defendant] had to receive the rifle barrels, repackage them, secrete them inside the range hoods, and then send them back to Saudi Arabia. The rifle barrels had to be repackaged and concealed in such a way that they would be undetectable as they made their way from one side of the globe to the other. As one final step in accomplishing this, [the Defendant] had to take the affirmative step to make false statements on the shipping documents about the contents of the packages he was shipping.

(*Id.*) Thus, the Defendant's actions evidence more knowledge and substantive participation in the overall scheme than that of a minor participant. *United States v. Hua*, 59 F. App'x 125, 127 (7th

6

Cir. 2003) ("Even if the nature of his participation suggests that [the defendant] played a lesser role, the district court was not constrained to award the adjustment."); *United States v. Kerr*, 13 F.3d 203, 206 (7th Cir. 1993) ("[T]he fact that one plays a much lesser role than another does not mean that one is a minor participant"). Though the Defendant did not come up with the scheme or make tactical decisions as to where to send the parts,[1] he understood that he and his co-conspirators were engaged in an illegal conspiracy to sell weapon parts, he used his home as a staging ground for the primary part of the scheme, and he actively participated in the offense when he: (1) unpackaged the rifle barrels and range hoods; (2) took apart the range hoods; (3) repackaged the barrels by zip typing them, wrapping them in paper, and concealing them in kitchen range hoods; (4) put the range hoods back together and packaged the whole set for shipment to Saudi Arabia; and (5) made false statements on shipping documents about the contents of the packages.

Accordingly, the Defendant was not a minor participant in the scheme, and Court denies the request for a reduction in the offense level based upon the Defendant's role.

**B.      Harm to the United States or Security Interests**

U.S.S.G. § 2M5.2 provides a base offense level of 26 for the exportation of arms, munitions, or military equipment or services without the required validated export license. Application Note 1 states that:

> The base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. In the unusual case where the offense conduct posed no such risk, a downward departure may be warranted.

---

[1] In fact, contrary to the Seventh Circuit's instruction, this argument compares the Defendant to that of the leader(s) of the conspiracy and not an average participant. *See Gallardo*, 497 F.3d at 741.

U.S.S.G. § 2M5.2, n.1.

The Defendant argues that there is no evidence that any Americans suffered harm or that the weapons were used against Americans. Thus, the Defendant maintains that his actions did not negatively impact the security or foreign policy interests of the United States. He argues that his actions simply constituted the "exportation to an ally nation of lawfully purchased civilian rifle barrels that can be found on the shelves at Wal-Mart," and did not implicate the "unauthorized exportation to antagonistic nations (like, for example, North Korea) of fearsome military grade-weapons." (Def.'s Sentencing Mem. 13.) The Defendant asserts that American foreign policy with respect to Saudi Arabia has been to increase the supply of firearms, and thus, the only victim in this case is the Saudi government, which lost out on import taxes.

Upon review of the Application Note, the Court finds that the Note states that the base offense level "assumes that the offense conduct was harmful or ***had the potential to be harmful*** to a security or foreign policy interest of the United States." U.S.S.G. § 2M5.2, n.1 (emphasis added). Though the Defendant contends that the rifle barrels were used to make firearms for hunting purposes, the Defendant had no control over what happened to those rifle barrels once they reached Saudi Arabia. Indeed, the Court finds that the illegal export and sale of the barrels in a foreign country had the potential to be harmful to American security and foreign policy interests. Whether or not the Defendant sold the barrels within an ally nation of the United States does not change the potential danger posed by the Defendant's actions—conspiring to sell weapon parts in a covert manner. *See United States v. Sero*, 520 F.3d 187, 191–92 (2d Cir. 2008) (affirming a district court's holding that "it is not a good defense to say that the defendant sold to the right side or that he was not selling directly to the insurgents." A "citizen cannot pick and choose the firearm vendees that he will wish to deal with to the detriment of the policies of the

8

State department"). Similar to *Sero*, the Defendant here made no good faith attempt to receive an export license and his activity had potentially harmful effects. *Id.* This is not the "unusual case" where there is "***no*** such risk" of harm to this country's interests. (U.S.S.G. § 2M5.2, n.1 (emphasis added).)

The Defendant additionally makes policy-based arguments and points out that the barrels were legally purchased in the United States and that the sale of the barrels in the United States appears to be legal; "[h]owever, if that same individual were to ship just a barrel (not even a complete firearm) out of the country, he would then be guilty of a federal crime; the logic of this disparate treatment is of course dubious, at best." (Def.'s Sentencing Memo. 14.) The Defendant also contends that his crimes did not "help sustain any drug addictions nor cause any apparent economic loss to any American victims nor further any other crimes . . . ." (*Id.* at 13.)

The Court declines to comment on the rationale behind the policy-making of our nation's gun and drug laws. Furthermore, it is not the Court's role to deliberate on the politics surrounding foreign policy. The fact is, the export of rifle barrels out of this country without the proper licensing is illegal, and the Defendant signed on to participate in what he knew was an illegal activity to sell weapon parts in a foreign country without a license. It is apparent that this activity of selling weapon parts in a foreign country had the potential to be harmful to the United States and its national security. *See United States v. Reyes*, 270 F.3d 1158, 1171 (7th Cir. 2001) ("[The Defendant's] self-serving ideas about the seriousness of his crimes are more properly addressed to the U.S. Congress and the U.S. Sentencing Commission. It is the Sentencing Commission's duty to recommend the proper guidelines and forward them to Congress for the enactment of legislation, and [the Defendant's] biased opinion dealing with the 'seriousness' of

his crime is of absolutely no import because it is irrelevant under the plain language of the Guideline.").

Accordingly, the PSR accurately reflects the base offense level pursuant to the Sentencing Guidelines. The Court notes that after *United States v. Booker,* 375 F.3d 508 (7th Cir. 2004), the Seventh Circuit has "declared the concept of departures 'obsolete' and 'beside the point.'" *United States v. Walker*, 447 F.3d 999, 1006 (7th Cir. 2006); *see also United States v. Johnson,* 427 F.3d 423, 426 (7th Cir. 2005) ("[the defendant's] framing of the issue as one about 'departures' has been rendered obsolete by our recent decisions applying *Booker* . . . [A]fter *Booker* what is at stake is the reasonableness of the sentence, not the correctness of the 'departures' as measured against pre-*Booker* decisions that cabined the discretion of sentencing courts to depart from guidelines that were then mandatory."); *United States v. Laufle,* 433 F.3d 981, 986–87 (7th Cir. 2006) ("Now that *Booker* has rendered the Guidelines advisory and district courts have much broader authority to sentence outside the recommended range, departures are beside the point."); *United States v. Castro–Juarez,* 425 F.3d 430, 434–36 (7th Cir. 2005) (looking at departure analysis "only by way of analogy" to aid a court's determination of the sentence's reasonableness). "Now, instead of employing the pre-*Booker* terminology of departures, we have moved toward characterizing sentences as either fitting within the advisory guidelines range or not." *Johnson*, 427 F.3d at 426. Thus, the Court will consider these arguments by analogy in its 18 U.S.C. § 3553(a) analysis.

## CONCLUSION

For the reasons stated above, the Defendant's objections to the PSR are OVERRULED. At the time of sentencing, the Court will address the portion of the Defendant's Sentencing

Memorandum [ECF No. 44], in which the Defendant requests a variance in consideration of 18 U.S.C. § 3553 sentencing factors.

SO ORDERED on April 18, 2018.

s/ Theresa L. Springmann  
CHIEF JUDGE THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT